[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 2, 2010
JOHN LEY
CLERK

_____

No. 08-16999

_____

D. C. Docket No. 06-00038-CR-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DEON MONROE JONES,
a.k.a. Johnny Lee Jones,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(April 2, 2010)

Before TJOFLAT, PRYOR and MARTIN, Circuit Judges.

MARTIN, Circuit Judge:

Deon Monroe Jones ("Mr. Jones") appeals his convictions and sentences on four counts: (1) knowing possession of a firearm and ammunition by a convicted felon on June 1, 2004, in violation of 18 U.S.C. § 922(g)(1); (2) knowing possession of a firearm and ammunition by a controlled substances user on June 1, 2004, in violation of 18 U.S.C. § 922(g)(3); (3) knowing possession of ammunition by a convicted felon on June 18, 2004, in violation of 18 U.S.C. § 922(g)(1); and (4) knowing possession of ammunition by a controlled substances user on June 18, 2004, in violation of 18 U.S.C. § 922(g)(3). Mr. Jones raises seven issues on appeal. We will discuss all but one here.[1] After review and oral argument, we affirm in part, reverse in part, vacate in part, and remand for further proceedings.

**I.**

In the early morning of June 1, 2004, David Buskirk ("Mr. Buskirk") was shot with a .38 caliber bullet outside his home in Savannah, Georgia. Detective Robert Von Lowenfeldt ("Detective Von Lowenfeldt") led the investigation into Mr. Buskirk's shooting, and, over the course of his investigation, identified Mr. Jones as a prime suspect. On June 18, 2004, Detective Von Lowenfeldt helped execute a warrant for Mr. Jones's arrest, for violation of his parole. During a search of Mr. Jones's bedroom at his mother's house, the police found twelve .38

---

[1] Because we reverse two of the four counts of conviction, and remand for resentencing, we need not address Mr. Jones's challenges to his current sentence.

caliber rounds and four .44 caliber rounds.

On June 23, 2004, Detective Von Lowenfeldt conducted a videotaped interview of sixteen-year-old Kelly Bigham ("Ms. Bigham"). In their conversation, Ms. Bigham informed the detective that she had sold a .38 revolver to Mr. Jones. She described how she and Mr. Jones drove to a nice area of town, where Mr. Jones shot a white man. After the interview, Ms. Bigham directed Detective Von Lowenfeldt to the street on which Mr. Buskirk lived, and she demonstrated how Mr. Jones got out of the car, fired at the man, and got back into the car.

On February 8, 2006, Mr. Jones was indicted on two counts: possession of twelve rounds of .38 special ammunition and four rounds of .44 caliber ammunition, on June 18, 2004, (1) as a convicted felon and (2) as a user of controlled substances. A jury found him guilty on both counts, but Mr. Jones successfully appealed these convictions. On Mr. Jones's first appeal, we concluded that the district court's instructions to the jury were unduly coercive. United States v. Jones, 504 F.3d 1218, 1219 (11th Cir. 2007). For that reason, we reversed Mr. Jones's convictions and remanded for a new trial. Id. at 1220.

In late November 2007, shortly after the mandate was issued, the government received a letter from Gregory Seabrook ("Mr. Seabrook"), who was incarcerated with Mr. Jones. Mr. Seabrook offered to provide information divulged by Mr.

Jones about his role in the Buskirk assault and about Mr. Jones's subsequent arrest. Over the following months, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), investigated these matters. ATF agents interviewed Mr. Seabrook and other inmates, who said Mr. Jones had confided in them.

Armed with this freshly acquired evidence, the government brought new charges against Mr. Jones. On December 13, 2007, a federal grand jury returned a Superseding Indictment, adding Counts One and Two and reindicting as Counts Three and Four the two crimes charged in the original indictment. After a second trial, a jury convicted on all four counts. At sentencing, the district court merged Count One with Two and Count Three with Four. Evaluating the 18 U.S.C. § 3553(a) factors, the district court noted the seriousness of the offense, Mr. Jones's "sinister nature" and criminal history, the need to provide just punishment for the offense, his lack of remorse, and the great risk he posed to society. Having stated these reasons, the district court varied from the Sentencing Guidelines' applicable sentencing range of 130 to 162 months and sentenced Mr. Jones to 200 months imprisonment. Mr. Jones timely appealed.

**II.**

Mr. Jones makes the following arguments on appeal: (1) that the delay in bringing him to trial violated the Speedy Trial Act; (2) that the counts of the Superseding Indictment are multiplicitous; (3) that the counts added by the Superseding Indictment are the product of prosecutorial vindictiveness; (4) that the district court erred when it admitted a videotaped interview of Ms. Bigham as past recollection recorded; (5) that the government's nondisclosure of certain documents violated the Jencks Act and Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); and (6) that there was insufficient evidence to support a conviction on any of the counts.

**A.**

We are first required to determine whether the delay in bringing Mr. Jones to trial amounts to a violation of the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161–3174 (the "Act"). This Court reviews *de novo* the denial of a motion to dismiss for violation of the Speedy Trial Act. United States v. Harris, 376 F.3d 1282, 1286 (11th Cir. 2004).

When a defendant successfully appeals his conviction, the Speedy Trial Act allows only seventy days between the date that the district court receives the

mandate and the date the defendant's retrial begins. United States v. Lasteed, 832 F.2d 1240, 1243 (11th Cir. 1987); see also 18 U.S.C. § 3161(e). New charges added by a superseding indictment do not reset the speedy-trial timetable for offenses either charged in the original indictment or required under double jeopardy principles to be joined with such charges. United States v. Young, 528 F.3d 1294, 1296 (11th Cir. 2008).

The Act "excludes from the 70-day period days lost to certain types of delay." Bloate v. United States, No. 08-728, --- S. Ct. ----, 2010 WL 757660, at *5 (Mar. 8, 2010). Specifically, "[t]he eight subparagraphs in subsection (h)(1) address the automatic excludability of delay generated for certain enumerated purposes. Thus, we first consider whether the delay at issue in this case is governed by one of these subparagraphs." Id. at *6.

When conducting the speedy-trial calculus, a court should not include "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(D). Also relevant to this case, subsection 3161(h)(1)(H) provides for exclusion of "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." Id. § 3161(h)(1)(H). "In calculating

includable time, both the date on which an event occurs or a motion is filed and the date on which the court disposes of a motion are excluded." United States v. Yunis, 723 F.2d 795, 797 (11th Cir. 1984).

The district court must promptly dispose of pretrial motions for which no hearing is required. 18 U.S.C. § 3161(h)(1)(D). "Prompt disposition" "depends upon when the court takes the motion 'under advisement' for purposes of § 3161(h)(1)[(H)]." United States v. Davenport, 935 F.2d 1223, 1228 (11th Cir. 1991). A motion is "under advisement" once the parties have filed the last piece of necessary information, at which point the court has thirty days to act before the speedy-trial clock restarts. Id.

On November 21, 2007, the district court received this Court's mandate, reversing Mr. Jones's convictions and remanding for a new trial. From that date, the government had seventy days to bring Mr. Jones to trial. See Lasteed, 832 F.2d at 1243. On December 13, the government filed its superseding indictment, which did not cause the clock to reset on the original charges. See Young, 528 F.3d at 1296.

On December 21, twenty-nine nonexcludable days after receipt of the mandate, Mr. Jones filed two motions, one to dismiss multiplicitous counts and one to dismiss the superseding indictment. These tolled the speedy-trial clock until the

government responded and an additional thirty days elapsed. On January 9, 2009, before that period expired, Mr. Jones filed a slew of new motions. Both parties agree that these motions required a hearing before a magistrate judge. Accordingly, the speedy-trial clock remained stopped at twenty-nine days and would not restart until the magistrate judge held a hearing, received all necessary documents, and either resolved the pending motions or allowed an additional thirty days to pass. See Dunn, 345 F.3d at 1292.

After the March 26, 2008 hearing, the magistrate judge referred two motions to the district court and requested further briefing on two others. The magistrate judge issued his findings orally at the hearing, and entered a written minute order on March 28, 2008. Also on March 28, Mr. Jones filed a Motion for In Camera Hearing, challenging the magistrate judge's ruling on his Motion for Discovery of Exculpatory Evidence. Mr. Jones argued that because there was a "strong suggestion that Brady material exists, the trial court should hold an in camera review to determine if the suppression of such material is proper." The government filed its response on April 9, 2008. On June 23, 2008, the district court denied the motion without holding or even scheduling a hearing.

In deciding Mr. Jones's Renewed Motion to Dismiss the Super[s]eding Indictment for Speedy Trial Violation, the district court excluded the time period

8

from May 10—thirty days after the government's filing—to June 23—the date on which it denied Mr. Jones's Motion for In Camera Hearing. We must therefore decide whether a motion that requests a hearing necessarily tolls the speedy trial clock until the district court disposes of the motion, even when the district court disposes of the motion without either scheduling or holding a hearing. We conclude that it does not.

In United States v. Stafford, 697 F.2d 1368 (11th Cir. 1983), this Court set out the basic framework for applying the Speedy Trial Act's time exclusions. Id. at 1373–74. In instances, like this case, where no hearing is required,

> the period of exclusion begins at the filing of the motion and ends at the point of its 'prompt disposition.' The inclusion of the promptness requirement was 'intended to provide a point at which time will cease to be excluded, *where motions are decided on the papers filed without hearing*.'

Id. at 1373 (quoting S. Rep. No. 96-212, at 34 (1979)) (emphasis added). The words "prompt disposition" were intended to "'exclud[e] time between filing and disposition on the papers,'" and thereby prevent "'circumvention of the 30-days, "under advisement" provision contained in Subsection (h)(1)[(H)].'" Id. at 1374 (quoting S. Rep. No. 96-212, at 34); see also Henderson v. United States, 476 U.S. 321, 329, 106 S. Ct. 1871, 1876 (1986) ("'[I]f motions are so simple or routine that they do not require a hearing, necessary advisement time should be considerably

9

less than 30 days.'" (quoting S. Rep. No. 96-212, at 34)); <u>United States v. Scott</u>, 270 F.3d 30, 57 (1st Cir. 2001) ("Congress plainly wanted even more complicated motions than the one here to be decided within 30 days of a hearing, and less complicated motions, decided without a hearing, to be decided 'promptly,' within that 30-day period."). In <u>Stafford</u> we made no distinction between instances in which no hearing was requested, and instances in which a hearing was requested but not held. <u>See</u> <u>Stafford</u>, 697 F.2d at 1373–74. The relevant consideration is whether the district court expressed its belief that a hearing was necessary by either scheduling or actually holding a hearing to resolve the motion.[2]

In this case, the district court neither scheduled nor held a hearing to resolve Mr. Jones's Motion for In Camera Hearing. Because no hearing was required, the motion was under advisement of the district court as of the date the government filed its response on April 9, 2008. The district court then had thirty days in which to rule on the motion. When the thirty days of excludable time elapsed on May 10,

---

[2] At oral argument, the government attempted to analogize this case to <u>United States v. Mers</u>, 701 F.2d 1321 (11th Cir. 1983). However, the motions addressed in <u>Mers</u> were motions to suppress, for which the magistrate judge set a hearing date. <u>Id.</u> at 1335. A motion to suppress evidence is precisely the type of pretrial motion for which a well-reasoned ruling typically is not possible without a hearing. <u>See</u> <u>United States v. Garcia</u>, 778 F.2d 1558, 1562 (11th Cir. 1985) ("A <u>James</u> motion and a fourth amendment suppression motion are procedurally alike. Both call for a hearing."). Mr. Jones filed a decidedly different Motion for In Camera Hearing. Here, in contrast with <u>Mers</u>, the district court gave no indication that it needed additional information from the parties, that any evidence was missing, or that a hearing would facilitate resolution of Mr. Jones's Motion. Also unlike <u>Mers</u>, no date for a hearing was ever set.

the speedy-trial clock began to run.  Mr. Jones was brought to trial seventy-five nonexcludable days after the district court received this Court's mandate—a violation of the Speedy Trial Act.

The Speedy Trial Act has been violated and the original counts, now numbered Counts Three and Four, must be dismissed.  18 U.S.C. § 3162(a)(2).  In light of the violation, we must decide whether these charges are to be dismissed with or without prejudice.

B.

The Act sets out certain factors to guide courts as they decide whether to dismiss with or without prejudice:

> [T]he court shall consider, among others, each of the following factors:  [1] the seriousness of the offense; [2] the facts and circumstances of the case which led to the dismissal; and [3] the impact of a reprosecution on the administration of this chapter and on the administration of justice.

18 U.S.C. § 3162(a)(2).  Where the defendant is charged with a serious crime, the delay was minor, the defendant suffered no prejudice from the delay, and the government did not actively seek delay, dismissal should be without prejudice.  See United States v. Carreon, 626 F.2d 528, 533 (7th Cir. 1980); see also United States v. Russo, 741 F.2d 1264, 1267 (11th Cir. 1984) ("Where the crime charged is serious, the court should dismiss only for a correspondingly severe delay.").

When the result of this balancing test is so clear that remand constitutes an unnecessary expenditure of judicial resources, a court of appeals ought to engage the § 3162(a)(2) factors rather than remand on the issue of prejudice. See United States v. Miranda, 835 F.2d 830, 834–35 (11th Cir. 1988). Here, an additional hearing is unlikely to uncover facts not revealed after two trials and two appeals. "'We would not serve the purposes of the Speedy Trial Act by precipitating a needless hearing with the risk of a further appeal . . . .'" Id. at 835 (quoting United States v. Tunnessen, 763 F.2d 74, 80 (2d Cir. 1985)).

Applying these principles to the facts of this case, we conclude that dismissal without prejudice is required by the Act. As to the first factor, possession of ammunition by a convicted felon and drug user are clearly serious crimes. Mr. Jones has a lengthy criminal past and has exhibited recidivist tendencies. Both of these considerations weigh heavily in favor of dismissing without prejudice to allow for reprosecution. See United States v. Johnson, 29 F.3d 940, 946 (5th Cir. 1994). In light of the seriousness of the crimes charged, only serious delay would justify dismissal with prejudice. However, in this case, the Act's seventy-day limit was exceeded by only five days.

Second, under the facts and circumstances of this case, the government's delay is excusable. We refrain from "penaliz[ing] the government for its conduct"

where, as here, "the particular violation [was] unique." United States v. Godoy, 821 F.2d 1498, 1505 (11th Cir. 1987). Dismissal without prejudice is warranted where "[t]he error that occurred is non-compliance with a procedural requirement clarified for this circuit by today's decision.'" Tunnessen, 763 F.2d at 79. In the absence of guiding case law, the government's interpretation of the Act was colorable.

Finally, "[t]he length of delay, a measure of the seriousness of the speedy trial violation, in some ways is closely related to the issue of the prejudice to the defendant." United States v. Taylor, 487 U.S. 326, 340, 108 S. Ct. 2413, 2421 (1988). Prejudice to Mr. Jones does not tip the scales in favor of dismissal with prejudice. The delay in prosecution was brief—five days—and did not impair Mr. Jones's ability to present his defense.

For these reasons, we conclude that Counts Three and Four must be dismissed without prejudice for violation of the Speedy Trial Act.

C.

Having found a violation of the Speedy Trial Act as to Counts Three and Four, we turn to whether delay also warrants dismissal of Counts One and Two—the new counts added in the Superseding Indictment. Mr. Jones argues that double jeopardy principles require the joining of all four counts. He contends that

13

the seventy-day speedy-trial clock ran from the date of his arraignment on the charges in the original indictment, not from the date of the superseding indictment. Therefore, by Mr. Jones's calculation, well over 600 nonexcludable days elapsed between arraignment and trial, a clear violation of 18 U.S.C. § 3161(c)(1).

However, double jeopardy principles do not require the joining of Counts One and Two with Counts Three and Four. As will be discussed in Part III, the charged acts of possession do not constitute a continuing course of conduct. When a defendant possesses different weapons at different times or places, the government may treat them as separate units of prosecution. See United States v. Bonavia, 927 F.2d 565, 568–69 (11th Cir. 1991). Therefore, Counts One and Two charge separate offenses from those charged in Counts Three and Four, and Mr. Jones's Speedy Trial Act claims fail as to these new charges. As such, the violation of the Speedy Trial Act dispenses only with Counts Three and Four and it is necessary to evaluate Mr. Jones's alternative grounds for appeal as they relate to Counts One and Two.

## III.

Mr. Jones argues that the government charged him multiple times for the exact same behavior, thereby arbitrarily carving one continuing act of possession

into separate counts. He asserts that the Superseding Indictment is multiplicitous, and that the district court erred by allowing him to be tried on the separate counts.

"Although we [have] stated . . . that we would review the multiplicity holding for abuse of discretion, we [have] actually conducted a legal analysis of the appellants' double jeopardy arguments which was essentially *de novo*." United States v. Sirang, 70 F.3d 588, 595 (11th Cir. 1995); compare United States v. Howard, 918 F.2d 1529, 1532 (11th Cir. 1991) ("We review the district court's decision [to deny a motion to compel consolidation and/or election of multiplicitous charges] for abuse of discretion."), with United States v. Smith, 231 F.3d 800, 807 (11th Cir. 2000) ("We review whether counts in an indictment are multiplicitous *de novo*."). "An indictment is multiplicitous if it charges a single offense in more than one count." United States v. Williams, 527 F.3d 1235, 1241 (11th Cir. 2008). Under this analysis, a multiplicitous indictment violates double jeopardy principles by giving the jury more than one opportunity to convict the defendant for the same offense. Id. "We analyze issues of double jeopardy under the test set forth by the Supreme Court in Blockburger v. United States." Id. at 1240 (citing Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932)). We note that this Court uses the same Blockburger test "to determine

whether an indictment is multiplicitous, verifying that each count requires an element of proof that the other counts do not require." Id. at 1241.

Double jeopardy principles have a particular application for crimes of possession. "[G]enerally, possession is a course of conduct; by prohibiting possession Congress intended to punish as one offense all of the acts of dominion which demonstrate a continuing possessory interest in a firearm." United States v. Rivera, 77 F.3d 1348, 1351 (11th Cir. 1996) (citation and internal quotation marks omitted). "Where there is no proof that possession of the same weapon is interrupted, the [g]overnment may not arbitrarily carve a possession into separate offenses." Id. Double jeopardy protects against government attempts to charge separate dates in separate counts where possession was a continuous course of conduct. Id. at 1352. "[S]imultaneous possession of a firearm and ammunition should be punished as one offense." United States v. Hall, 77 F.3d 398, 402 (11th Cir. 1996), abrogation on other grounds recognized by United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008). However, where a defendant has possessed different weapons at different times or places, the government may treat them as separate units of prosecution and charge multiple counts. Bonavia, 927 F.2d at 568–69.

The crux of Mr. Jones's argument on appeal is that the government presented insufficient evidence at trial to demonstrate anything more than continuing possession. He challenges the credibility of the government's witnesses and argues that the government failed to present "uncontroverted evidence . . . at trial, that [he] had acquired the ammunition separately from the firearm, or that [he] had possessed the ammunition and firearm separately."

The district court used a verdict form that required the jury to make special findings. The jury specifically found that Mr. Jones knowingly possessed a firearm on June 1, 2004, and that he possessed .38 caliber ammunition on that same date. It also specifically found both that Mr. Jones possessed .38 caliber ammunition on June 18, 2004, and that he possessed .44 caliber ammunition on June 18. Because the jury found that Mr. Jones possessed a firearm on a separate date from the ammunition, the possession charged is not a continuing course of conduct. Counts One and Two did not duplicate Counts Three and Four. See Bonavia, 927 F.2d at 568–69. Additionally, while Mr. Jones was found to be in possession of .44 caliber ammunition on June 18, 2004, he was not charged in Counts One and Two with possession of the same. That being the case, possession of .44 caliber ammunition on June 18, as specifically found by the jury, is a separate element of the crime for which Mr. Jones was convicted in Counts Three and Four. The inverse is true for

possession of the firearm—it is an element of Counts One and Two, but not Counts Three and Four.

The government presented sufficient evidence to support the jury's findings. Through the testimony of several witness, the government linked Mr. Jones to the shooting of Mr. Buskirk with a .38 revolver on June 1 in downtown Savannah. For instance, at the second trial, Mr. Seabrook testified that while he and Mr. Jones were incarcerated together, the defendant told Mr. Seabrook about his role in the Buskirk shooting. Mr. Seabrook explained that Mr. Jones acquired the gun, a .38 caliber firearm, from a girl named "Kelly." Mr. Seabrook also informed the jury that Mr. Jones claimed to have purchased the ammunition from a drug addict in exchange for money and drugs. Meanwhile, when on June 18 the police searched Mr. Jones's home in Thunderbolt, Georgia, they found only .38 and .44 caliber ammunition, but no firearm. Mr. Seabrook also testified that Mr. Jones disposed of the firearm two days after the shooting by throwing it into a sewage drain. Therefore, even if the .38 caliber ammunition found in Thunderbolt on June 18 (as charged in Counts Three and Four) was the same as that Mr. Jones possessed on June 1 (as charged in Counts One and Two), Mr. Jones separated these rounds from the .38 revolver. Because Mr. Jones separated the gun from the ammunition, the government is permitted to treat each as a separate unit of prosecution. Bonavia,

927 F.2d at 569; cf. United States v. Grinkiewicz, 873 F.2d 253, 255 (11th Cir. 1989) (concluding possession was singular conduct where multiple weapons were seized in "different, although closely proximate, areas in the same building at the same time"). Based on the evidence presented, a reasonable jury could have found that Mr. Jones retained the .38 caliber rounds for approximately two weeks after disposing of the revolver, transported them to his mother's home in Thunderbolt, and stored them in his bedroom where they were found on June 18.[3]

The district court did not err by denying Mr. Jones's Motion to Dismiss the Multiplicitous Indictment. Counts One and Two charge separate offenses from Counts Three and Four, and the indictment does not violate double jeopardy principles.

## IV.

Mr. Jones argues that Counts One and Two are the product of prosecutorial vindictiveness and that the district court erred when it denied his pretrial motion to dismiss the superseding indictment for prosecutorial misconduct.

---

[3] Our conclusion that possession in this case was not a continuing course of conduct is also supported by trial evidence that Mr. Jones separately acquired the .38 revolver and the .38 caliber ammunition. Both Ms. Bigham, in her interview, and Mr. Seabrook, in his trial testimony, indicated that Ms. Bigham provided Mr. Jones with the weapon. Meanwhile, Mr. Seabrook testified that Mr. Jones acquired the ammunition from a "crack head" in exchange for drugs and money.

19

We review a district court's decision on whether to dismiss an indictment on grounds of prosecutorial misconduct for abuse of discretion. United States v. Barner, 441 F.3d 1310, 1315 (11th Cir. 2006). This Court reviews *de novo* the legal question of whether a presumption of vindictiveness arises from the facts of the case. Id.

"As a general rule, as long as the prosecutor has probable cause to believe the accused has committed a crime, the courts have no authority to interfere with a prosecutor's decision to prosecute." Id. However, the government may not, "without explanation, increase the number of or severity of those charges in circumstances which suggest that the increase is retaliation for the defendant's assertion of statutory or constitutional rights." Hardwick v. Doolittle, 558 F.2d 292, 301 (5th Cir. 1977).[4] Adding charges after a defendant's successful appeal gives rise to a presumption of vindictive prosecution. Barner, 441 F.3d at 1315–16. The government may rebut this presumption "by establishing [its] reasons for adding the two new charges were other than to punish a pesky defendant for exercising his legal rights." Hardwick, 558 F.2d at 301. "[O]bjective evidence justifying the prosecutor's action," such as a showing "that it was

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

impossible to proceed on the more serious charge at the outset," rebuts the presumption. United States v. Goodwin, 457 U.S. 368, 376 n.8, 102 S. Ct. 2485, 2490 n.8 (1982) (citation and internal quotation marks omitted). Once rebutted, the defendant's vindictive prosecution defense will survive if he can affirmatively demonstrate actual prosecutorial vindictiveness. See Barner, 441 F.3d at 1322. In other words, he must show that the government's justification is pretextual. See United States v. Meyer, 810 F.2d 1242, 1245 (D.C. Cir. 1987).

The district court did not abuse its discretion by denying Mr. Jones's motion to dismiss for prosecutorial vindictiveness. Assuming without deciding that the added charges of Counts One and Two give rise to a presumption of vindictiveness,[5] the government has rebutted this presumption. The government received Mr. Seabrook's letter after this Court issued the mandate from the first appeal. It was only then that the government had sufficient evidence to confidently bring the additional possession charges. Because the government has provided an objective explanation for the new charges, it is incumbent on Mr. Jones to

---

[5] This Court distinguishes instances in which the prosecutor substitutes a more serious charge for the original charge and those in which new charges are based on independent acts. Where the latter is the case, adding charges does not give rise to a presumption of prosecutorial vindictiveness. Humphrey v. United States, 888 F.2d 1546, 1549 (11th Cir. 1989). This principle holds true even where the separate acts that prompted the new charges occurred in "the same spree of activity." United States v. Taylor, 749 F.2d 1511, 1513 (11th Cir. 1985) (citation and internal quotation marks omitted). Under these circumstances, relief is only available if the defendant can prove actual vindictiveness. Id.

demonstrate actual vindictiveness—a burden he has not carried.  See Hardwick, 558 F.2d at 301; Barner, 441 F.3d at 1322.  The district court did not abuse its discretion when it denied Mr. Jones's motion to dismiss on grounds of prosecutorial vindictiveness.

## V.

Mr. Jones argues that the district court erred when it admitted a videotaped interview of Ms. Bigham as past recollection recorded.  Prior to trial, the government informed Mr. Jones and the district court of its intent to offer the video as evidence, pursuant to Rules 804(b)(1) (former testimony) and 804(b)(3) (statement against interest) of the Federal Rules of Evidence.

At trial, the district court permitted the jury to view the full video of Ms. Bigham's custodial interrogation as part of the government's case-in-chief.  The district court admitted the video not under the government's original theory that the hearsay exceptions for unavailable declarants applied, but rather as past recollection recorded, pursuant to Rule 803(5).  During deliberation, the jury sent the court a note, requesting a second viewing of the video.  Over Mr. Jones's objection, the district court allowed the video to be played for the jury a second time.

Mr. Jones argues that by admitting the video as past recollection recorded, the district court erred in its application of the Federal Rules of Evidence. He next contends that, regardless of whether the evidentiary ruling was correct, the district court's decision also violated the Confrontation Clause. Finally, Mr. Jones asserts that the district court erred when it played the video for the jury a second time. We address each of these arguments in turn.

A.

"This Court reviews a district court's evidentiary rulings for a clear abuse of discretion. A district court's evidentiary rulings will only be reversed if the resulting error affected the defendant's substantial rights." United States v. Delgado, 321 F.3d 1338, 1347 (11th Cir. 2003) (citations and internal quotation marks omitted).

Federal Rule of Evidence 803(5) sets out the predicates for admission of past recollections recorded. For one thing, the Rule requires the proponent to demonstrate that the witness-declarant's memory has faded so that he is no longer able "to testify fully and accurately." Fed. R. Evid. 803(5).

At trial, the government elicited a handful of responses from Ms. Bigham that indicated she lacked "clear and distinct recollection in [her] response to the question[s]" regarding the subject matter of her interview with Detective Von

23

Lowenfeldt. <u>NLRB v. Hudson Pulp & Paper Corp.</u>, 273 F.2d 660, 665 (5th Cir. 1960). She could not remember that she sold Mr. Jones the .38 revolver "in the end of April of 2004." She also could not recall Mr. Jones making any statements about the gun. After showing Ms. Bigham the video, outside the presence of the jury, the government inquired into whether Ms. Bigham's memory had been refreshed. In response to a question about whether she remembered "more about the things you did with Deon Jones than you did before we watched the video," she responded, "I remember what was just said." When pressed further, she responded that she could recall "some" of the relevant events. Before the court showed Ms. Bigham the video, Mr. Jones conceded to its use for the purpose of refreshing recollection. Based on this record, we do not find that the district court clearly abused its discretion in concluding that Ms. Bigham lacked sufficient memory to testify to the subject matter of the video.

Rule 803(5) also requires that the witness verify the contents of the past statement. "The witness must be able now to assert that the record accurately represented his knowledge and recollection at the time. The usual phrase requires the witness to affirm that he knew it to be true at the time." <u>Lopez v. United States</u>,

373 U.S. 427, 448 n.1, 83 S. Ct. 1381, 1393 n.1 (1963) (citation and internal quotation marks omitted).

Here, Ms. Bigham arguably verified the contents of the video through her testimony at trial. First, she testified that it was easier to remember the events described in the videotape at the time of the interrogation than on the date of the trial. When the government asked whether the things said were true and accurate to the best of her knowledge, Ms. Bigham responded, "If that was what was said then, that's what I remember then, what was just in the video." Further, Ms. Bigham also testified that she repeated the contents of her interview in juvenile court, and she agreed that "the things that [she] [said] to the detective at that time [were] true and accurate to the best of [her] knowledge." Finally, as to whether the video was an accurate record of her statements to Detective Von Lowenfeldt, Ms. Bigham acknowledged, at a minimum, "that's me talking" on the video.[6]

---

[6] Mr. Jones maintains that the district court also committed error in admitting the video despite the presence of statements about which Ms. Bigham had no personal knowledge. Mr. Jones points to four instances when either Ms. Bigham or Detective Von Lowenfeldt made statements that themselves constituted an additional layer of hearsay or were based upon the speculation of the declarant. Having reviewed the trial transcript, we conclude that in each case, either another hearsay exemption applied or the substance of the statement duplicates other evidence and testimony presented at trial. This being the case, failure to purge the video of these four statements was unlikely to have had a substantial impact on the verdict of the jury and was, therefore, harmless. See United States v. Docampo, 573 F.3d 1091, 1097 (11th Cir. 2009) ("The admission of hearsay alone does not mandate a reversal of conviction: to require a new trial a significant possibility must exist that, considering the other evidence presented by both the prosecution and the defense, the statement had a substantial impact upon the verdict of the jury."

The government's efforts to demonstrate compliance with the Rule 803(5)'s prerequisites were lackluster, at best. However, we review application of the Federal Rules of Evidence for abuse of discretion. "In applying this standard, we will affirm a district court's evidentiary ruling unless the district court has made a clear error of judgment or has applied an incorrect legal standard." Conroy v. Abraham Chevrolet-Tampa, Inc., 375 F.3d 1228, 1232 (11th Cir. 2004) (citation and internal quotation marks omitted). We conclude that on the facts presented here, admission of the video as past recollection recorded was not a clear error of judgment on the part of the district judge.

## B.

Mr. Jones contends that admission of Ms. Bigham's videotaped statement violated his rights under the Confrontation Clause. However, this argument does not withstand scrutiny. The Supreme Court has emphasized that "a primary interest secured by [the Confrontation Clause] is the right of cross-examination." Douglas v. Alabama, 380 U.S. 415, 418, 85 S. Ct. 1074, 1076 (1965). However, the Sixth Amendment "guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the

---

(citation, internal quotation marks, and internal alterations omitted)).

26

defense might wish." Kentucky v. Stincer, 482 U.S. 730, 739, 107 S. Ct. 2658, 2664 (1987) (citation and internal quotation marks omitted). "Ordinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions." United States v. Owens, 484 U.S. 554, 556, 561, 108 S. Ct. 838, 841, 844 (1988) (holding that a victim-witness was subject to cross-examination even where he had been beaten so badly that he could not remember seeing his assailant; the identity of numerous guests he had received while in the hospital; or if any of the guests had suggested that he identify the defendant as his assailant).

In this case, Ms. Bigham was present at trial and subject to unrestricted cross-examination. Ms. Bigham answered Mr. Jones's questions while under oath and before a jury. The jury was able to evaluate the credibility of her testimony as well as her statements on the video. Therefore, admitting the video did not violate Mr. Jones's Sixth Amendment right to confront witnesses against him. See id. at 560, 108 S. Ct. at 843 (noting that neither indicia of reliability nor particularized guarantees of trustworthiness are called for "when a hearsay declarant is present at trial and subject to unrestricted cross-examination. . . [because] the traditional

27

protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements." (citations omitted)).

C.

Finally, allowing the video of Ms. Bigham's statement to be played a second time for the jury does not warrant reversal. Rule 803(5) explicitly states that "[i]f admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party." Fed. R. Evid. 803(5). On the first day of deliberation, the jury submitted a note asking to again watch Ms. Bigham's interrogation video. The following day, the district court permitted a second viewing. The district court denied Mr. Jones's request that Ms. Bigham's cross-examination be read to the jury as well.

Mr. Jones argues that by watching the video for a second time during deliberation, the jury essentially received the video as an evidentiary exhibit, in direct contravention of Rule 803(5). Furthermore, he maintains that because no cross examination testimony was heard, the district court also deprived him of his Sixth Amendment rights.

We will assume, for the purposes of this discussion, that the district court committed both constitutional and non-constitutional errors in playing the video to

the jury again during their deliberation. Even assuming these errors, however, they are harmless.

Insofar as Mr. Jones alleges that the second showing of the video deprived him of protections afforded by the Sixth Amendment, these "violations are subject to the harmless error standard." United States v. Edwards, 211 F.3d 1355, 1359 (11th Cir. 2000). Under this standard, the "inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986). This test is more demanding than that applied to non-constitutional violations. As we have noted:

> non-constitutional error is harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the verdict, or had but very slight effect. If one can say with fair assurance that the judgment was not substantially swayed by the error, judgment is due to be affirmed even though there was error.

United States v. Hornaday, 392 F.3d 1306, 1315–16 (11th Cir. 2004) (citations, internal quotation marks, and alterations omitted).

Though Ms. Bigham's testimony was important to the government's case, the second presentation of the video provided only cumulative evidence. The jury

29

watched the entire filmed interview during trial. Also, while Mr. Seabrook's testimony may have been contradictory, he did corroborate Ms. Bigham's interview as to the key elements of Counts One and Two—that Mr. Jones possessed a .38 revolver and shot a man with .38 caliber ammunition. Given this additional evidence, even absent a second viewing of the video, the government's case against Mr. Jones was strong. The record also demonstrates that the district court's refusal to read Ms. Bigham's cross-examination testimony did not affect the outcome of the case. Forty minutes after the second viewing, the jury sent the judge a note stating that "[t]he video did not change any positions."

For these reasons, even assuming a Confrontation Clause violation, we conclude that any error that did occur was harmless beyond a reasonable doubt. Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438. Insofar as playing the video during jury deliberation violated the terms of Rule 803(5), this non-constitutional error was similarly harmless. In light of all the evidence available to the jury, "we can 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by [a second playing of the video],' and therefore 'substantial rights were

not affected.'" Hornaday, 392 F.3d at 1316 (quoting Kotteakos v. United States, 328 U.S. 750, 765, 66 S. Ct. 1239, 1248 (1946)).

Neither the district court's admission of Ms. Bigham's videotaped interview nor the second playing of the video during jury deliberation warrants reversal of Mr. Jones's convictions for Counts One and Two.

## VI.

Mr. Jones also argues that because the government failed to comply with the requirements of the Jencks Act and Brady, he is entitled to a new trial, in which Mr. Seabrook would be barred from testifying.[7]

Shortly before trial, the government filed an "Ex Parte Notice (Filed Under Seal) of Nondisclosure of Certain Witness Statements." The government sought not to disclose certain letters and other information provided by cooperating witnesses—fellow prison inmates—who were afraid of Mr. Jones because they believed him to be a member of a gang active in prison. The district court granted the government's request to file the statements and materials ex parte and under seal.

---

[7] Mr. Jones makes two passing references to the Confrontation Clause but offers no argument on that issue. For that reason, we need not address whether in this case nondisclosure of certain evidence violates the Confrontation Clause. See Doe v. Moore, 410 F.3d 1337, 1349 n.10 (11th Cir. 2005).

Among the documents attached to the government's ex parte notice were descriptions of witness interviews and letters—written by Mr. Seabrook and other inmates—offering testimony against Mr. Jones. Included among these was a handwritten letter dated December 25, 2007, and signed by Mr. Seabrook (the "December 25 letter"). In it, Mr. Seabrook offered "valuable information that [he] believe[d] could help [the government's] case tremendously." The letter provided no detail about this information, except that Mr. Jones told Mr. Seabrook and four other inmates "what [Mr. Jones] [did] with the gun." The letter also indicated that "each [of the four] was familiar with . . . [R]ule 35." At the bottom of the page, Mr. Seabrook listed the names and register numbers of the four other inmates, one of which was Eddie F. Jackson ("Mr. Jackson").

Another handwritten letter, dated December 26, 2007 (the "December 26 letter"), was substantively identical to the December 25 letter. Minor discrepancies between the two included spelling and punctuation errors; use of the word "inmates" instead of "individuals" or "guys"; and use of "papers" instead of "mail." Additionally, the December 25 letter had no address blocks, but the December 26 letter featured the prosecutor's address and Mr. Seabrook's return address at the top of the page. The two letters were written in very different handwriting, and

whereas the December 25 letter closed with Mr. Seabrook's signature and the names of the four other inmates, the December 26 letter was unsigned and listed only Mr. Jackson's name at the bottom of the page. Review of the record also reveals an envelope written in the same handwriting as the December 26 letter and bearing Mr. Jackson's return address as well as a December 26 postmark.

On September 16, 2008, two months after the conclusion of the trial, the government unsealed documents not yet disclosed to Mr. Jones. The government concedes that it never disclosed the December 26 letter, but the parties hotly contest whether the December 25 letter was among those documents handed over to Mr. Jones at the beginning of Mr. Seabrook's trial testimony. On December 2, 2008, Mr. Jones filed a Motion for a New Trial.

The district court denied Mr. Jones's motion, finding no violation of the Jencks Act. The district court noted that the parties disputed certain information related to the December 26 letter. Mr. Jones contended that Mr. Seabrook wrote the letter. The government argued that the December 26 letter was actually authored by an inmate other than Mr. Seabrook and, in any event, was a mere copy of the December 25 letter. The district court adopted the government's position, finding that Mr. Seabrook wrote the December 25 letter and that the December 26

33

letter was a mere copy. The district court also found that the government produced the December 25 letter to Mr. Jones in advance of the trial, on July 1, 2008. For these reasons, the district court held that the government had not violated the Jencks Act.

## A.

Findings of fact are reviewed for clear error. See United States v. Williams, 875 F.2d 846, 853 (11th Cir. 1989). When it denied Mr. Jones's Motion for a New Trial, the district court found that the government had disclosed the December 25 letter approximately one week before trial. However, the government concedes on appeal that on July 1 it disclosed this letter only to the district court and not Mr. Jones. Thus, the district court clearly erred in finding that the December 25 letter had been timely disclosed to Mr. Jones. Therefore, we will evaluate Mr. Jones's Brady and Jencks Act objections as though the December 25 letter was not produced at the time Mr. Seabrook took the stand.

## B.

We review a district court's Jencks Act findings for clear error. Williams, 875 F.2d at 853. "The harmless error doctrine is applicable to Jencks Act violations, but it must be strictly applied." United States v. Beasley, 2 F.3d 1551,

1557 (11th Cir. 1993). Nondisclosure of inculpatory statements that are wholly consistent with the witnesses' testimony amounts to harmless error. Id. at 1557 & n.10.

We review *de novo* alleged Brady violations. United States v. Schlei, 122 F.3d 944, 989 (11th Cir. 1997). In order to establish a Brady violation, the defendant must demonstrate, among other things, "that had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceedings would have been different." United States v. Newton, 44 F.3d 913, 918 (11th Cir. 1995).

Nondisclosure of the letters was harmless for both Jencks Act and Brady purposes. Because the letters were inculpatory, the only purpose they could serve for Mr. Jones was for impeaching Mr. Seabrook. Mr. Jones argues that the letter might have helped demonstrate that Mr. Seabrook learned of the facts of the case not through a jailhouse confession, but by going through Mr. Jones's legal documents. On cross-examination, Mr. Jones explored this theory. Mr. Seabrook testified that Mr. Jones kept all his legal documents in a locked locker and that Mr. Seabrook only saw those that Mr. Jones voluntarily showed him. This testimony is wholly consistent with the letters' contents.

Neither would the letters have provided additional leverage for Mr. Jones when addressing Mr. Seabrook's motivations for testifying. At trial, Mr. Seabrook suggested that he cooperated with the government, at least in part, because his plea agreement obligated him to do so. However, even without the letters, Mr. Jones impeached Mr. Seabrook by eliciting testimony that he was also motivated by a potential sentence reduction. Indeed, Mr. Jones's very first question to Mr. Seabrook inquired into his motive for testifying, and Mr. Seabrook conceded that he cooperated with the prosecutors in the hopes that the government would reduce his sentence. Because there is no contradiction between Mr. Seabrook's testimony and the letters, they were of minimal impeachment value and their nondisclosure was harmless.

The jury knew that Mr. Seabrook was in jail at the time he testified and that he was a government informant. He admitted that he was testifying against Mr. Jones in the hopes that the government would reduce his sentence. We conclude that any additional impeachment value that Mr. Jones might have derived from the letters would have been minimal. Nondisclosure was, therefore, harmless.

## VII.

On appeal, Mr. Jones challenges the sufficiency of the evidence against him. This Court reviews a defendant's challenge to the sufficiency of the evidence *de novo*. United States v. Toler, 144 F.3d 1423, 1428 (11th Cir. 1998). "[W]e must decide whether the evidence, examined in a light most favorable to the Government, was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt. All credibility choices must be made in support of the jury's verdict." United States v. Williams, 390 F.3d 1319, 1323 (11th Cir. 2004) (citations and internal quotation marks omitted).

We conclude that there is ample evidence to support convictions on Counts One and Two. Ms. Bigham described Mr. Jones's participation in the June 1 assault on Mr. Buskirk. Under the test adopted by this circuit, her description of the incident was not incredible as a matter of law: the physical evidence does not directly contravene Ms. Bigham's description. See United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997). At trial, a forensic expert testified that he observed three damaged vehicles several blocks behind the spot where Ms. Bigham said Mr. Jones stood on June 1. However, the expert did not know if the damage was related to the Buskirk assault, nor did he find bullets near the vehicles.

Furthermore, Ms. Bigham's story was corroborated by the testimony of Mr. Seabrook. The jury also heard Detective Von Lowenfeldt detail how Ms. Bigham led him to Mr. Buskirk's residence and accurately described it as the scene of the assault.

Credibility decisions are the exclusive province of the jury. Calderon, 127 F.3d at 1325. Taking the evidence in the light most favorable to the prosecution, a panel of reasonable jurors could have found that Mr. Jones knowingly possessed a .38 revolver and .38 special ammunition on June 1, 2004. There is, therefore, sufficient evidence to support convictions on Counts One and Two, which we affirm.

The district court considered Mr. Jones's convictions together for the purposes of sentencing. Because we reverse Mr. Jones's convictions on Counts Three and Four, we now vacate his sentences and remand for resentencing on Counts One and Two.

## VIII.

For the reasons stated, we **AFFIRM** Mr. Jones's convictions on Counts One and Two and **REVERSE** his convictions on Counts Three and Four. Mr. Jones's sentence on all counts is **VACATED**. We **REMAND** the case to the district court

with instructions to **DISMISS** Counts Three and Four **WITHOUT PREJUDICE**

and to resentence Mr. Jones on Counts One and Two.